OPINION
{¶ 1} Defendant-appellant, Scott Hampton, appeals from a judgment of the Franklin County Court of Common Pleas convicting him of engaging in a pattern of corrupt activity, kidnapping, and three counts of robbery, and sentencing him to 14 years in prison. For the following reasons, we affirm.
 {¶ 2} On February 27, 2003, the Franklin County Grand Jury indicted defendant Hampton, as well as Timothy Gaines and Jeremy Williamson, on one count of engaging in a pattern of corrupt activity, one count of participating in a criminal gang, and multiple counts of robbery and kidnapping. Specifically, the charges against defendant were as follows: count one, engaging in a pattern of corrupt activity; count two, participating in a criminal gang; count three, aggravated robbery of Monica Omari, with firearm and gang specifications; count four, aggravated robbery of Kenric Duffy, with firearm and gang specifications; count five, kidnapping of Monica Omari, with firearm and gang specifications; count six, kidnapping of Kenric Duffy, with firearm and gang specifications; count nine, aggravated robbery of Brian Valley, with firearm and gang specifications; count ten, kidnapping of Brian Valley, with firearm and gang specifications.
 {¶ 3} On July 18, 2003, a jury trial commenced. The first trial resulted in a mistrial as a result of the emergence of previously unknown evidence. On July 21, 2003, the trial court filed a journal entry, which stated in part:
On Monday, July 21, 2003, counsel for the state advised that additional evidence, unknown to the prosecution, was disclosed by the investigating detective on Friday, July 18th and Monday, July 21, 2003. The court explored various options with counsel for both parties. The defense moved for a mistrial, which was granted and the jury was discharged.
 {¶ 4} On May 11, 2004, a second jury trial commenced. At the beginning of defendant's second trial, counts two (participating in a criminal gang), five (kidnapping of Monica Omari, with specifications), and six (kidnapping of Kenric Duffy, with specifications), were dismissed. Defense counsel moved for a dismissal of the remaining charges in the indictment on the basis of the constitutional prohibition against double jeopardy. The trial court denied defendant's motion, and the case proceeded on the remaining charges. At the second trial, four individuals testified: Brian Valley, Monica Omari, Jessica Davis, and Kenric Duffy.
 {¶ 5} Brian Valley testified as follows. On the evening of October 24, 2002, Mr. Valley, an Ohio State University student, went to a concert in Cincinnati with his brother and a friend. The three drove back to Columbus, he dropped off his brother and the friend at a restaurant, and then proceeded to his apartment at East 12th Avenue, in Franklin County. He arrived at the apartment at approximately 1:00 or 1:30 a.m., Friday, October 25, 2002, and parked his car outside in a parking lot behind the apartment complex. As he exited his car, he saw two men approaching him. One man asked him if he could "score him some dope." (May 11, 2004, Tr. 41.) He answered in the negative, and then the man came closer to him, pulled out a small black automatic gun, placed it at his stomach, and told him to get out his keys. Mr. Valley described this man as approximately 5 feet 9 or 5 feet 10 inches tall and stocky. The man was wearing a baseball cap.
 {¶ 6} Mr. Valley gave the man the car keys, and the man pointed to the other individual, who was about 15 to 20 feet away from them. That man also pulled out a gun, "to show [Mr. Valley] he had one on him." (Id. at 43.) Mr. Valley described that man as taller and thinner than the other, and that he was wearing a blue bandanna on his head. Mr. Valley got into the car and sat on the front passenger seat. The man, who first approached him, got into the driver's seat, and the second man sat in the backseat, behind Mr. Valley. The second man put a gun to Mr. Valley's head. Mr. Valley was told that if he did not fully cooperate with them, they would kill him. They told him not to look at their faces and to put his head between his legs. The two men told Mr. Valley that their actions were gang-related. The driver stated that he wanted to go to an ATM machine in a quiet area. The driver drove downtown and then to State Route 161. They arrived at an ATM, and Mr. Valley was told to withdraw money. He withdrew $300, gave them the cash, got back into the car, and put his head between his legs.
 {¶ 7} Mr. Valley testified that the driver pulled into a parking lot, another car pulled up, and the drivers discussed where they were going to meet. He could not see the other car or the driver of the other car. They drove to another location and ordered Mr. Valley to get out of the car and to not look back at them or they would kill him, and to wait about five minutes before leaving. They told him where his car could be found, with the keys in it. He exited the car, did not look back, waited about five minutes, and walked to his car, which he found at the location they had specified. In addition to the $300, the men had taken his watch and wallet. He then drove home and called the police. A Columbus police officer arrived at Mr. Valley's home and took a report. A few days later a detective spoke with Mr. Valley and showed him a photo array. He was able to identify one of the men, the driver of his car, who was Timothy Gaines.
 {¶ 8} Monica Omari testified as follows. In October of 2002, Ms. Omari worked at the Platinum Fox on Hamilton Road in Franklin County. On October 25, 2002, she left work at about 3:30 a.m., with approximately $1,500 in cash she had earned. Ms. Omari's boyfriend, Kenric Duffy, had been waiting for her outside to take her home. They drove to her home at an apartment complex, which was about one-half mile away. When they parked in the parking lot, Ms. Omari noticed a four-door, "silverish-color" car drive by in front of them. (Id. at 82.) Ms. Omari believed there were four persons in the car, which to her "looked like a Chevy, like a Cavalier." (Id. at 83.) She saw two men exit the car and approach them. She asked Mr. Duffy whether he knew them, and he told her he did not know them.
 {¶ 9} The two men, with guns displayed, approached Ms. Omari and Mr. Duffy from both sides of their car, and ordered them to come out of the car. She described one of the men as "short and stocky," and the other as "real tall." (Id. at 84.) She testified that the shorter man was wearing a red bandanna over his face, and the other man was wearing a blue bandanna over his face. The man that approached on Ms. Omari's side of the car had an automatic gun. He ordered her to give him her possessions. She gave him her workbag and her purse, which contained the $1,500 in cash. She saw the other man pointing a gun at Mr. Duffy and Mr. Duffy giving the man his possessions. She then saw the two men run toward the car, which was moving, and get into it. She testified that she noticed that the license plate of the car said, "TIM'S BABY." (Id. at 92.) After the assailants left in the car, Ms. Omari and Mr. Duffy ran into their apartment and Ms. Omari dialed 911.
 {¶ 10} On October 27, 2002, Ms. Omari met with a detective, who showed her photo arrays. She was able to identify the man that held the gun to her. She was unable to identify the driver of the getaway vehicle, but described the person as a white male.
 {¶ 11} Mr. Duffy's testimony at the second trial was as follows. In October 2002, Ms. Omari was living with Mr. Duffy in his apartment. Around 2:30 or 3:00 a.m., on October 25, 2002, Mr. Duffy picked up Ms. Omari at the Platinum Fox, where she worked. They drove back to his apartment. Mr. Duffy noticed another car following them to the apartment complex. As he was backing his car into a parking space, he saw the other car in front of them. According to Mr. Duffy's testimony, there were three persons that were visible in the other car. He described the car as a "light silver or bluish Chevy Lumina." (May 13, 2004, Tr. 126.) Mr. Duffy testified that two men approached him and Ms. Omari, and while they were approaching them, the car they had been inside continued to move. (Id. at 127.) The two men tapped on the windows of the car with guns, demanded that they get out of the car, and demanded money. Mr. Duffy gave them cash, a watch, and a necklace. Upon looking at photo arrays shortly after the robbery, Mr. Duffy was able to identify Gaines and Williamson as the two men who approached his car.
 {¶ 12} Regarding the identity of the driver, Mr. Duffy testified as follows at the second trial:
[Prosecutor]: Handing you state's exhibit 7, and it also has six photographs, correct?
[Mr. Duffy]: That's correct.
Q. Now, that document, you didn't sign your name on any picture; is that correct?
A. That's right.
Q. You signed it above all of the pictures?
A. Right.
Q. Why did you do that?
A. I wasn't sure exactly, but the number 1 and number 4 guy stood out.
Q. Number 1 and number 4?
A. Right.
Q. Okay. Now, where did you recognize number 1 or number 4 as?
A. As the driver.
Q. From?
A. As the driver of the vehicle.
Q. Which vehicle would that be?
A. The Lumina, silver one.
Q. Did you see anyone in the courtroom that resembles either the individual in photograph number 1 or photograph number 4?
A. Yes, I do.
Q. And where do you see this person that resembles?
A. The gentleman sitting right there.
Q. Can you describe what he's wearing?
A. Light blue shirt with a grayish, blue tie.
[Prosecutor]: Your Honor, would the record reflect that the witness has identified the defendant?
The Court: Insofar as he says that it looks like — which one? Number 1 or 4 or both?
[Mr. Duffy]: Number 1 and four.
The Court: Looks, insofar as it appears to be similar to, looks like those pictures, yes.
Q. And does the individual that you just pointed out, resemble one of those pictures more than another?
A. Yes, they do.
Q. Which one?
A. Number 4.
Q. And do you recognize, from where did you say you recognized the photographs numbered 1 and 4 from?
A. As the driver.
(May 13, 2004, Tr. 140-142.)
 {¶ 13} Jessica Davis testified at the second trial, and her testimony was as follows. Ms. Davis first met defendant around November or December 2000 when she moved into an apartment after turning 18 years old. Defendant helped her move into the apartment. A romantic relationship between the two developed and defendant moved in with her. Ms. Davis testified that she did not get along well with defendant, and the two would verbally and physically fight. They would periodically break up and then reconcile. Defendant moved out of the apartment in April 2001, but moved back for a brief period in September 2002. About two weeks prior to defendant moving back with her in September 2002, defendant asked Ms. Davis if a friend of his, Williamson, could live with her. Ms. Davis decided to let Williamson move in with her.
 {¶ 14} When defendant moved back in with Ms. Davis, she heard a conversation between defendant and Williamson relating to gang activity. Specifically, Ms. Davis testified as follows:
A. Basically, they were talking about being in a gang and going out and doing illegal activities to get money. That's basically what the conversation was about. I wasn't trying to listen too hard.
Q. Why's that?
A. Because a lot of the conversations like that that come out of their mouths are just bogus, so I usually didn't pay too much attention.
(May 12, 2004, Tr. 179.) Ms. Davis testified that defendant referred to Williamson as his "O.G." or "Original Gangster," that the gang's name was the "Rolling Sixties Crips," and that no persons other than Williamson, Gaines, and defendant were ever mentioned as members of the gang. (Id. at 180.) However, she indicated that defendant wanted to get neighborhood kids involved in the gang by physically beating them, as an initiation. She also testified that "they showed gang symbols. They told me they wore gang colors." (May 13, 2004, Tr. 38.) During the two-week period after defendant moved back in with her in September 2002, Ms. Davis heard regular conversations regarding gangs. During these conversations defendant and Williamson discussed selling drugs and robbing people for money.
 {¶ 15} Ms. Davis voiced her concerns to defendant about his being involved in a gang. Two or three weeks after defendant had moved back in with Ms. Davis, she asked him to leave. He left, but within a week she let him stay with her for a couple of days because he had been in a fight with his new roommate. He left again, and she did not hear from him until Thursday, October 24, 2002.
 {¶ 16} On October 24, 2002, Ms. Davis was at the home of Brandy Sergeant, who was her friend and neighbor. According to Ms. Davis, Williamson and Ms. Sergeant were together as boyfriend and girlfriend. While she was at Ms. Sergeant's home, Ms. Sergeant went outside to see Williamson, who was with Gaines and defendant. Defendant called Ms. Sergeant's home and Ms. Davis answered. Defendant informed Ms. Davis that he, Williamson, and Gaines, were going to go do some things.
 {¶ 17} At approximately 2 a.m. on October 25, 2002, defendant again called Ms. Sergeant's home. Ms. Sergeant answered the telephone and handed it to Ms. Davis. Ms. Davis testified as to what was said in that telephone call:
I asked him where he was. He said he was driving. I asked him whose car he was driving. He said, "Tim's car." I said, "Where's Tim and Jeremy?" He said, "They are in the car in front of us." And I asked him what he was doing. And, you know, he said "We got some stuff to do, we're about to get some money, some G." That is what he told me. And then there was a muffle. He said, "Hold on." He put the phone down or he covered it, one or the other, and then he got back on the phone and said he was holding a gun.
(May 12, 2004, Tr. 190.) According to Ms. Davis, defendant said that Gaines and Williamson were driving "some dude's" car, and that they were near State Route 161 and Karl Road, going to a bank. (Id. at 191.) Ms. Davis testified that defendant said that they were going to "pull a lick," which, according to Ms. Davis, means "robbing somebody, stealing something." (May 13, 2004, Tr. 64.) When the conversation ended, Ms. Davis hung up the telephone.
 {¶ 18} Ms. Davis then went outside to a pay phone to call defendant back on the cell phone he was using. She wanted to know what was happening with defendant. When she contacted defendant, she asked what they were doing, but she did not get much of a response because Gaines got into the car with defendant and was asking defendant why he was on the phone and to whom he was talking. Defendant indicated that he had to go and hung up the telephone and did not call back.
 {¶ 19} Approximately one hour and 15 minutes later, Ms. Sergeant knocked on Ms. Davis's door and stated that she needed Ms. Davis to go with her to pick up Williamson. Ms. Davis went with Ms. Sergeant to Gahanna to pick up Williamson. When they arrived in Gahanna, they saw a police blockade about two miles away. They turned into a side road, where Williamson was hiding under a car. According to Ms. Davis, Williamson "popped out from underneath a car and hopped in the back seat, laid down." (May 12, 2004, Tr. 195.) They drove back to the apartment building where Ms. Davis and Ms. Sergeant lived. On the way back to the apartment building, Williamson told Ms. Davis about a robbery. He told her that he had robbed someone at the person's car. He told her that he had gotten into the backseat of the car, Gaines got into the driver's seat, and defendant followed them in Gaines's girlfriend's car. He further told her that they had taken the person in the car at gunpoint to a bank to withdraw money from an ATM. According to Ms. Davis, the car of Gaines's girlfriend was a "lavender, purple" Chevrolet Lumina, with a "TIM'S BABY" license plate. (Id. at 205.) Williamson told Ms. Davis that there was another incident that night, which occurred after they dropped off defendant. Regarding this incident, Ms. Davis testified that "[Williamson] told [her] nothing happened. They didn't get anything. He was really very nervous and very — not himself when he was talking about that one." (May 12, 2004, Tr. 206.)
 {¶ 20} Williamson had informed Ms. Davis that guns had been used in the robbery, and that he did not want to recover the gun himself. At some point in time that night, Ms. Davis and Ms. Sergeant went back to Gahanna, because of Ms. Davis's conversation with Williamson. They drove to a bridge, which was about one-half mile from Gaines and Williamson's home. Receiving directions by phone from Williamson, Ms. Davis recovered two guns.
 {¶ 21} The jury found defendant guilty of count one, engaging in a pattern of corrupt activity, a felony of the first degree; guilty of count three, aggravated robbery, a felony of the first degree; guilty of count four, aggravated robbery, a felony of the first degree; guilty of count nine, aggravated robbery, a felony of the first degree; and guilty of count ten, kidnapping, a felony of the second degree. As to counts three, four, nine, and ten, the jury found defendant guilty of the firearm and gang specifications.
 {¶ 22} On July 12, 2004, the trial court entered judgment, sentencing defendant to prison. Specifically, the trial court sentenced defendant to three years in prison as to count one, seven years as to count three, four years as to count four, seven years as to count nine, and three years as to count ten. The trial court ruled that counts three and four are to be served concurrently with each other but consecutively to counts nine and ten, counts nine and ten are to be served concurrently with each other but consecutively to counts three and four, and count one is to be served concurrently with all of the other counts. Therefore, the total sentence imposed was 14 years in prison. Defendant received 488 days of credit for time served.
 {¶ 23} Defendant appeals from that judgment, and has asserted the following five assignments of error:
FIRST ASSIGNMENT OF ERROR
The trial court erred in denying the defense motion to dismiss following the declaration of a mistrial, thereby, violating theFifth and Fourteenth Amendments to the United States Constitution and Section 10, Article I of the Ohio Constitution.
SECOND ASSIGNMENT OF ERROR
The trial court erred in admitting hearsay statements from co-conspirators that were not made in furtherance of the conspiracy and lacked independent proof of the conspiracy, as required by Evid.R. 801(D)(2)(e).
THIRD ASSIGNMENT OF ERROR
There was insufficient competent evidence to establish a corpus delicti as to the existence of a criminal enterprise or gang activity prior to introducing Appellant's statements.
FOURTH ASSIGNMENT OF ERROR
There was insufficient evidence to support the guilty verdicts as to the second robbery involving Omari and Duffy and the offense of engaging in a pattern of corrupt activity, thereby, depriving Appellant of his due process protections under the state and federal Constitutions.
FIFTH ASSIGNMENT OF ERROR
The trial court erred in imposing consecutive sentences based on facts not found by the jury or admitted by appellant. This omission violated Appellant's rights to a trial by jury and due process under the state and federal Constitutions.
 {¶ 24} Under defendant's first assignment of error, he argues that the trial court erred in denying his motion to dismiss, which followed the declaration of a mistrial. Defendant argues that he "was forced to move for a mistrial after the state sought to disclose highly damaging evidence that had not been provided to the defense in discovery." (Defendant's brief, at 12.) Moreover, defendant argues that "the declaration of a mistrial was instigated by prosecutorial misconduct designed to provoke a mistrial." (Id. at 18.) Defendant argues that the trial court's denial of his motion to dismiss violated the prohibition against double jeopardy contained in the state and federal constitutions. The state contends that the trial court did not abuse its discretion in denying defendant's motion to dismiss.
 {¶ 25} The Double Jeopardy Clauses of the Ohio and United States Constitutions protect a criminal defendant from repeated prosecutions for the same offense. State v. Rance (1999),85 Ohio St.3d 632, 634. As a general rule, when a trial court grants a defendant's motion for a mistrial, the Double Jeopardy Clause does not bar a retrial. State v. Loza (1994), 71 Ohio St.3d 61,70, citing Oregon v. Kennedy (1982), 456 U.S. 667, 671,102 S.Ct. 2083. "A narrow exception lies where the request for a mistrial is precipitated by prosecutorial misconduct that was intentionally calculated to cause or invite a mistrial." Id. Furthermore, "[o]nly where the prosecutorial conduct in question is intended to `goad' the defendant into moving for a mistrial may defendant raise the bar of double jeopardy to a second trial after having succeeded in aborting the first on his own." Id. "Mere negligence will not suffice to show intent to provoke a mistrial." State v. Ivers, Butler App. No. CA2002-12-305,2003-Ohio-6254, at ¶ 11, citing State v. Girts (1997),121 Ohio App.3d 539, 553.
 {¶ 26} On Friday, July 18, 2003, the first day of the first trial, the parties made opening statements, and three of the state's witnesses, Brian Valley, Kenric Duffy, and Monica Omari, testified. In defense counsel's opening statements, he stated that he anticipated that Jessica Davis would attempt to implicate defendant in robberies. In an effort to discredit her anticipated testimony, defense counsel indicated that Ms. Davis, as defendant's ex-girlfriend, had "a certain agenda." (July 18, 2003, Tr. 10.) He implied that she had waited over four months to go to the police regarding what she knew, which was "after a fall-out of sorts some time in March." (Id. at 11.)
 {¶ 27} At the beginning of the next day of trial, Monday, July 21, 2003, one of the prosecutors informed the court that, on the morning of the previous Friday, a Columbus police detective informed the state of the existence of a taped interview of defendant, which was in the possession of the detective. The prosecutor also discussed previously unknown information regarding Ms. Davis. Namely, the state asserted that it first learned that morning that Ms. Davis had looked at three photo arrays when she went to the police within days of the robberies. The timing of when Ms. Davis went to the police was significant in view of defense counsel's opening statements regarding her.
 {¶ 28} The state indicated its willingness not to use the interview of defendant or the three photo arrays that Ms. Davis had viewed. The state indicated its lack of knowledge regarding this evidence, and asserted that there had been no willful discovery violation. Defense counsel requested that any information regarding the October 27, 2002, police interview with Ms. Davis, as well as the photo arrays that she had viewed on that day, be suppressed. The state maintained that it would be inappropriate to suppress any information regarding the date Ms. Davis went to the police. Defense counsel argued that, had he known when Ms. Davis went to the police, which would have been revealed to him had he been provided the photo array shown to Ms. Davis, he would not have made the same opening statements regarding her. Defense counsel stated that if the trial court would not suppress the evidence, it was moving for a mistrial. The state opposed the request for a mistrial. The trial court determined that it could not suppress the evidence as requested by defendant, and accordingly declared a mistrial.
 {¶ 29} In his brief, defendant argues that, at the time the first trial ended, the state had not established key elements in support of its case against defendant. Defendant seems to argue that this provided motivation for the state to attempt to goad defendant into seeking a mistrial. Contrary to this argument, the status of the evidence at the time the prosecutors became aware of the evidence did not establish an intent to provoke a mistrial.
 {¶ 30} Nothing in the record indicates that the prosecution intentionally attempted to provoke the defense into seeking a mistrial. In fact, the state indicated a willingness not to use the taped interview of defendant and the photo arrays shown to Ms. Davis, in order to prevent a mistrial resulting from the emergence of this previously unknown evidence. Furthermore, we observe that the central reason for the granting of the mistrial was that defendant was prejudiced because his counsel would not have made the particular opening statements regarding the timeline of events, which would have been significantly undermined at trial, had he been provided the photo arrays shown to Ms. Davis. In this regard, the prosecution's assertion before the trial court that it was not aware, until the morning of trial, that Ms. Davis had been shown photo arrays, revealed that the prosecution did not intentionally withhold this evidence from the defense. Moreover, defendant has cited nothing in the record which would indicate that the prosecution intentionally misled his counsel into believing that Ms. Davis waited over four months to initially go to the police.
 {¶ 31} Under these facts, we cannot conclude that the prosecution was intentionally provoking defendant into seeking a mistrial. Therefore, the Double Jeopardy Clauses of the Ohio and United States Constitutions did not preclude the second trial in this case.
 {¶ 32} Accordingly, we overrule defendant's first assignment of error.
 {¶ 33} In his second assignment of error, defendant asserts that the trial court erred in admitting hearsay statements from co-conspirators. Defendant argues that the statements were not made in furtherance of the conspiracy, and that the statements lacked independent proof of the conspiracy.
 {¶ 34} Evid.R. 801(D)(2)(e) provides that a statement is not hearsay if it is "offered against a party * * * by a co-conspirator of a party during the course and in furtherance of the conspiracy upon independent proof of the conspiracy." In order for an out-of-court declaration of a co-conspirator to be admissible, the state must prove: (1) the existence of the conspiracy; (2) that the declaration was made during the course of the conspiracy; (3) that the declaration was made in furtherance of the conspiracy; (4) the declarant's participation in the conspiracy; and (5) the defendant's participation in the conspiracy. State v. Adkins (2000), 136 Ohio App.3d 765, 773.
 {¶ 35} In this case, defendant argues that the co-conspirators' statements were not made in furtherance of the conspiracy. Defendant cites various testimony by witnesses involving statements by Williamson, Gaines, or defendant, which related to gang activity. Defendant characterizes these statements as "bragging or boasting" by the declarant. (Defendant's brief, at 21.) Defendant cites to the testimony of Mr. Valley indicating that one of the robbers told him that the robbery was gang related. Defendant argues that the statement, which was from either Williamson or Gaines, was not made in furtherance of the conspiracy. This statement, made during the commission of the crime, reasonably could have evoked even more fear in the victim. Defendant cites to Ms. Davis's testimony regarding statements made to her by Williamson relating to illegal activity, including robbery. These statements by Williamson occurred at a time when he was attempting to conceal himself and the weapons from authorities. Finally, defendant cites to Ms. Davis's testimony regarding the discussions of the gang in front of her and relating to how she argued with defendant about his involvement with a gang. Regarding the discussions of the gang, the statements in those discussions could be viewed, to some extent, as being made in furtherance of the conspiracy. Also, to the extent defendant made the statements, they were not hearsay, pursuant to Evid.R. 801(D)(2)(a), as a statement is not hearsay if it is offered against a party and is his own statement. Furthermore, we find no reversible error in the admission of Ms. Davis's testimony regarding her statements to defendant indicating her displeasure that he was in a gang.
 {¶ 36} Defendant also argues that there was insufficient independent proof of the conspiracy in this case to permit the use of a co-conspirator's statement. "[P]ursuant to the express terms of the rule, the statement of a co-conspirator is not admissible pursuant to Evid.R. 801(D)(2)(e) until the proponent of the statement has made a prima facie showing of the existence of the conspiracy by independent proof." State v. Carter
(1995), 72 Ohio St.3d 545, 550. However, when independent proof of a conspiracy is admitted into evidence before a case is submitted to the jury, early admission of statements that could have been deemed hearsay at the time they were elicited is harmless. State v. Jalowiec (2001), 91 Ohio St.3d 220, 227, citing both Carter and State v. Smith (2000),87 Ohio St.3d 424.
 {¶ 37} In the case at bar, Ms. Davis testified as to numerous statements by defendant regarding his involvement in gang activity. She testified regarding conversations involving defendant and Williamson in which the two discussed their gang activities, including illegally obtaining money. She testified that defendant referred to Williamson as "Original Gangster," and that defendant wanted to initiate new members into their gang. Ms. Davis's testimony regarding defendant's statements provided independent proof of the conspiracy in this case.
 {¶ 38} Based on the foregoing, we overrule defendant's second assignment of error.
 {¶ 39} By his third assignment of error, defendant argues that, prior to the introduction of his statements, there was insufficient evidence to establish a corpus delicti as to the existence of a criminal enterprise or gang activity. The corpus delicti of a crime is essentially the fact of the crime itself. It consists of two elements: (1) the act; and (2) the criminal agency of the act. State v. Van Hook (1988), 39 Ohio St.3d 256,261; State v. Maranda (1916), 94 Ohio St. 364, paragraph one of the syllabus. In Maranda, at paragraph two of the syllabus, the Supreme Court of Ohio stated:
It has long been established as a general rule in Ohio that there must be some evidence outside of a confession, tending to establish the corpus delicti, before such confession is admissible. The quantum or weight of such outside or extraneous evidence is not of itself to be equal to proof beyond a reasonable doubt, nor even enough to make it a prima facie case. It is sufficient if there is some evidence outside of the confession that tends to prove some material element of the crime charged.
 {¶ 40} Defendant argues that the only evidence regarding a criminal enterprise and a gang were from his statements. Defendant's contention seems to be premised on his argument that the statements of the co-conspirators were not admissible. We have rejected that argument as it related to defendant's second assignment of error. In the case at bar, Mr. Valley testified that one of his assailants said that their actions were gang related. Furthermore, Mr. Valley's testimony supported an inference that Williamson and Gaines conspired with the person in the other car. Additional testimony indicated that Williamson and Gaines were assisted by a getaway driver in the robbery of Ms. Omari and Mr. Duffy. We conclude that there was evidence tending to establish the gang's existence that was admitted prior to the testimony regarding defendant's statements relating to his involvement in the gang.
 {¶ 41} Therefore, we overrule defendant's third assignment of error.
 {¶ 42} Defendant argues in his fourth assignment of error that there was insufficient evidence to support the guilty verdicts as to the robbery involving Ms. Omari and Mr. Duffy. Defendant also argues that because there was insufficient evidence to convict him of robbing Ms. Omari and Mr. Duffy, there was also insufficient evidence to convict him of engaging in corrupt activity. The state argues that there was sufficient evidence to support defendant's convictions and that the convictions were not against the manifest weight of the evidence.
 {¶ 43} In determining the sufficiency of the evidence, an appellate court must "examine the evidence admitted at trial to determine whether such evidence, if believed, would convince the average mind of the defendant's guilt beyond a reasonable doubt. The relevant inquiry is whether, after viewing the evidence in a light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt." State v. Jenks (1991),61 Ohio St.3d 259, paragraph two of the syllabus. Whether the evidence is legally sufficient to sustain a verdict is a question of law, not fact. State v. Thompkins (1997), 78 Ohio St.3d 380, 386.
 {¶ 44} Determinations of credibility and weight of the testimony remain within the province of the trier of fact. Statev. DeHass (1967), 10 Ohio St.2d 230, paragraph one of the syllabus. When assessing whether a conviction is against the manifest weight of the evidence, an appellate court must review the entire record, weigh the evidence and all reasonable inferences, consider the credibility of the witnesses, and ultimately determine "`whether in resolving conflicts in the evidence, the jury clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered.'" Thompkins, at 387, quotingState v. Martin (1983), 20 Ohio App.3d 172, 175. Furthermore, "`[t]he discretionary power to grant a new trial should be exercised only in the exceptional case in which the evidence weighs heavily against the conviction.'" Id.
 {¶ 45} In consideration of the evidence presented at trial, we find that it would be reasonable to infer that defendant was the driver of the getaway car in the robbery of Ms. Omari and Mr. Duffy. Defendant had indicated to Ms. Davis that he, Gaines, and Williamson had some things to do on the evening of October 24, 2002. There was testimony that a gang, consisting of these three men, was formed with an objective of robbing people for money. Defendant essentially admitted to Ms. Davis that he, as a participant, followed Gaines and Williamson, in the robbery and kidnapping of Mr. Valley. Williamson's statements to Ms. Davis indicated that defendant followed them in Gaines's girlfriend's car. Regarding the robbery of Ms. Omari and Mr. Duffy, testimony indicated that there were either three or four persons in the car involved in that robbery, and that someone other than Gaines and Williamson drove the car as it left the scene of the robbery. Ms. Omari testified that the getaway car's license plate said, "TIM'S BABY." Testimony revealed that Gaines's girlfriend's car had that license plate. Therefore, evidence presented at trial indicated that the getaway car in that robbery was the same car that was driven by defendant in connection with the robbery of Mr. Valley. Both robberies occurred in the early hours of October 25, 2002. More specifically as to their temporal proximity, the robbery of Ms. Omari and Mr. Duffy occurred sometime within one or two hours of the robbery of Mr. Valley. In view of the evidence presented at trial relating to these two robberies, it would be reasonable to conclude that defendant participated as the driver in both robberies.
 {¶ 46} We find that there was sufficient evidence to convict defendant of robbing Ms. Omari and Mr. Duffy, and that there was sufficient evidence to convict defendant of robbing and kidnapping Mr. Valley. Therefore, we also find that there was sufficient evidence to convict defendant of engaging in a pattern of corrupt activity. Furthermore, these convictions were not against the manifest weight of the evidence. This is not a case where the evidence weighed heavily against the convictions.
 {¶ 47} Accordingly, we overrule defendant's fourth assignment of error.
 {¶ 48} In his fifth assignment of error, defendant argues that the trial court erred in imposing consecutive sentences. Specifically, defendant argues that R.C. 2929.14(E)(4) "is unconstitutional because it requires the trial court, and not the jury, to make the factual findings necessary to enhance a sentence beyond the normal statutory maximum for the underlying offense." (Defendant's brief, at 31.) Defendant bases his argument on the United States Supreme Court decisions inApprendi v. New Jersey (2000), 530 U.S. 466, 120 S.Ct. 2348;Ring v. Arizona (2002), 536 U.S. 584, 122 S.Ct. 2428; andBlakely v. Washington (2004), 542 U.S. 296, 124 S.Ct. 2531.
 {¶ 49} In Apprendi, at 490, the United States Supreme Court held that, "[o]ther than the fact of a prior conviction, any fact that increases the penalty for a crime beyond the prescribed statutory maximum must be submitted to a jury, and proved beyond a reasonable doubt." In Blakely, at 303, the United States Supreme Court, in applying the rule in Apprendi, as well as citing Ring, held that the statutory maximum is "the maximum sentence a judge may impose solely on the basis of the factsreflected in the jury verdict or admitted by the defendant." (Emphasis sic.)
 {¶ 50} This court has considered and rejected the constitutional argument raised by defendant's fifth assignment of error. See, e.g., State v. Abdul-Mumin, Franklin App. No. 04AP-485, 2005-Ohio-522, at ¶ 30.
 {¶ 51} Accordingly, we overrule defendant's fifth assignment of error.
 {¶ 52} Having overruled all five of defendant's assignments of error, we affirm the judgment of the Franklin County Court of Common Pleas.
Judgment affirmed.
McGrath and McCormac, JJ., concur.
McCormac, J., retired of the Tenth Appellate District, assigned to active duty under authority of Section 6(C), Article IV, Ohio Constitution.